IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Channelbind International Corporation, ) | |
| ) | C.A. No. 7:08-2880-HMH |
| Plaintiff, ) | |
| ) | |
| vs. ) | **OPINION AND ORDER** |
| ) | |
| Esselte Corporation; Esselte Business ) | |
| Systems, Inc.; Esselte Dymo, N.V.; ) | |
| Esselte Ltd.; Esselte AB; Esselte BVBA; ) | |
| Esselte Holdings, Inc.; Esselte Business ) | |
| BVBA; Esselte Business Corporation; and ) | |
| Esselte Pendaflex Corporation, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on the Defendants' motion for summary judgment. After consideration, the court grants the Defendants' motion.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

The Plaintiff, Channelbind International Corporation ("Channelbind"), manufactures document binding products in Spartanburg, South Carolina. The Defendants are various related entities. Esselte Holdings, Inc. ("Esselte Holdings"), formerly known as Esselte Business Systems, Inc., is a Delaware holding company that does not sell or distribute any products. (Defs. Mem. Supp. Summ. J. Ex. I (William Lundregan ("Lundregan") Dec. ¶¶ 2-3).) Esselte Corporation is a New York corporation which sells and distributes office products in the United States. (Id. Ex. I (Lundregan Dec. ¶ 5).) Esselte Business BVBA ("Esselte Business"), successor in interest to Esselte BVBA, which was formerly known as Esselte, Dymo, N.V., is a

1

Belgian company that sells and distributes office products in Europe. (Id. Ex. J (Kjell Clefjord ("Clefjord") Dec. ¶ 2).) Channelbind and Esselte Holdings entered into a Distributor Agreement and Channelbind and Esselte Business entered into a Licensing Agreement to sell and distribute Channelbind's binding machines and covers in 1992 ("1992 Agreements"). (Id. Ex. A (Distributor Agreement) and Ex. B (Licensing Agreement).) Channelbind and Esselte Business extended the 1992 Agreements on August 5, 1999, for five years with automatic renewal every two years after the expiration of the five- year term. (Id. Ex. C (August 5, 1999 Letter of Understanding).) However, by letter dated May 11, 2004, Esselte Holdings allegedly terminated its Distributor Agreement as of December 31, 2004. (Defs. Mem. Supp. Summ. J. Ex. D (May 11, 2004 Letter).) According to the Licensing Agreement's terms, it would terminate automatically upon the termination of the Distributor Agreement. (Id. Ex. I (Lundregan Dec. ¶ 9).)

The Defendants allege that subsequently in 2005, Channelbind and Esselte Business engaged in unsuccessful negotiations for a new agreement. Instead, the Defendants allege that Channelbind and Esselte Business conducted business on a "purchase order basis," containing terms for price, quantity, and delivery. (Id. 3.) However, Esselte Business continued to periodically pay royalties to Channelbind for its products distributed in Europe. (Id. Ex. J (Clefjord Dec. ¶ 4).) By letter dated March 22, 2007, Esselte Holdings and "its affiliates" notified Channelbind that they were ceasing to "license, purchase and sell products from Channelbind" effective December 31, 2007. (Id. Ex. F (March 22, 2007).) Esselte Business began selling its ImpressBIND productline in Europe in 2008. Channelbind alleges that the

1992 Agreements did not terminate on December 31, 2004.  (Pl. Mem. Opp'n Summ. J. 2.)

Channelbind argues that

> [t]he correspondence between the parties in May and June of 2005 set forth the terms by which the business relationship of the parties was extended through June of 2008.  The Defendants operated strictly in accordance with this correspondence, making payments, including royalty payments, just as set forth in the correspondence.  Not until the Defendants wrongfully breached the contract by attempting to terminate early, confiscate the business of the Plaintiff and begin selling its competing product to the established customers for Plaintiff's products customers did the Defendants vary from the terms set forth in the May and June of 2005 communications.

(Id.)  Channelbind submits that pursuant to the parties' contractual agreement, the Defendants were required to transfer the business and customers lists upon termination.  Instead, Channelbind submits that "the Defendants refused to transition the business and, instead, began selling its competing product to customers who had formerly purchased products manufactured by the Plaintiff or licensed to the Defendants for manufacture."  (Id. 3.)

Channelbind alleges causes of action for breach of contract, conversion, breach of contract with fraudulent intent, breach of the implied covenant of good faith and fair dealing, violation of intellectual property rights, and violation of New York consumer protection laws.  The Defendants moved for summary judgment on September 17, 2009, alleging that they are entitled to summary judgment because:  (1) the court lacks "jurisdiction to reach the matters at issue in this case because Plaintiff has admitted that all of the [alleged wrongful] acts occurred in Europe" and (2) Channelbind did "not have a contract with any Defendant concerning the matters at issue in the complaint."  (Defs. Mem. Supp. Summ. J., generally.)  In the alternative, the Defendants move to dismiss Channelbind's claims for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Channelbind filed a response in

opposition on October 5, 2009. The Defendants filed a reply on October 16, 2009. This matter is ripe for consideration.

## II. Discussion of the Law

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

Moreover, "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

**B. The Defendants' Motion for Summary Judgment**

The Defendants move for summary judgment on all of Channelbind's claims, arguing that (1) the court lacks subject matter jurisdiction to determine foreign intellectual property matters; (2) there is no contract between Channelbind and any Esselte Defendant; (3) Channelbind's cause of action for conversion is preempted by federal law; and (4) Channelbind has not shown and cannot show any violation of the New York consumer protection laws. Channelbind concedes that any patent infringement claim fails because the United States patent laws are inapplicable in Europe. Further, Channelbind concedes that its violation of New York consumer protection laws claim fails. Therefore, the court grants the Defendants' motion for summary judgment on Channelbind's intellectual property claims and its claim alleging violation of New York consumer protection laws. Further, Channelbind agrees that its claim for breach of the covenant of good faith and fair dealing is subsumed in the breach of contract claim. "[T]he implied covenant of good faith and fair dealing is not an independent cause of action separate from the claim for breach of contract." RoTEC Servs., Inc. v. Encompass Servs., Inc., 597 S.E.2d 881, 884 (S.C. Ct. App. 2004). As such, the court will only address the Defendants' motion on the breach of contract and conversion claims.

**1. Breach of Contract Claim**

To recover for a breach of contract, a plaintiff must prove the existence of a contract, the breach of the contract, and damages caused by the breach. See Fuller v. East. Fire & Cas. Ins. Co., 124 S.E.2d 602, 610 (S.C. 1962). In order to have a binding contract, it is necessary that the parties to a contract have a meeting of the minds with regard "to *all* essential and material terms of the agreement." Player v. Chandler, 382 S.E.2d 891, 893 (S.C. 1989). Price, time, and

place are essential terms of a contract. Edens v. Laurel Hill, Inc., 247 S.E.2d 434, 436 (S.C. 1978). Furthermore, the assent must be as to all of the terms of the contract. See Lee v. Travelers' Ins. Co. of Hartford, Conn., 175 S.E. 429, 433 (S.C. 1934). "Where it is determined that the parties intended not to be bound until the written contract is executed, no valid and enforceable obligation will be held to arise." Bugg v. Bugg, 249 S.E.2d 505, 507 (S.C. 1978); McLaurin v. Hamer, 164 S.E. 2, 5 (S.C. 1932) (stating that there is no meeting of the minds between the parties when they are merely negotiating the terms of an agreement to be entered into); Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002) ("It is fundamental to contract law that mere participation in negotiations does not create a binding obligation, even if agreement is reached on all terms. More is needed than agreement on each detail–the parties must have intended to enter into a binding agreement.").

Channelbind submits that the parties' May and June 2005 correspondence evidences that the 1992 Agreements were extended through June 2008. Further, Channelbind argues that the parties' course of dealing establishes that the parties had an agreement. Thomas E. Hoffmeister ("Hoffmeister"), president of Channelbind, states in his affidavit that

> [t]he relationship [between Channelbind and the Defendants] grew from our original agreements in 1992. Each time an agreement was scheduled to expire, we would exchange correspondence and communication proposing to extend the term under certain terms and conditions. This occurred, for instance in June 1999. We exchanged letters confirming the manner in which we would proceed. Although there was mention of signing a more definitive agreement incorporating the terms, we simply proceeded to operate under these terms without signing an agreement which incorporated the terms to which we had both agreed.

(Hoffmeister Aff. ¶ 3.) The court finds that there are no genuine issues of material fact concerning whether a contract existed between the parties through June 2008. The court agrees

6

that the parties had extended the 1992 Agreements pursuant to a Letter of Understanding dated August 5, 1999. Further, the Letter of Understanding states that the parties intend to "update the provisions of th[e] [1992] Agreement[s] either via addenda or a complete rewrite." (Defs. Mem. Supp. Summ. J. Ex. C (August 5, 1999 Letter of Understanding).) However, the Letter of Understanding "lays out the principal business terms to be incorporated in an updated Agreement" and is signed by Magnus Nicolin, on behalf of Esselte Business, and signed and agreed to by Hoffmeister, on behalf of Channelbind. (Id. Ex. C (August 5, 1999 Letter of Understanding).) The Letter of Understanding was plainly intended to be a binding extension of the 1992 Agreements. There is no language in the Letter of Understanding that indicates that the terms contained therein are proposed terms that are the subject of negotiation.

By letter dated May 11, 2004, Esselte Holdings plainly terminated the 1992 Agreements effective December 31, 2004. (Defs. Mem. Supp. Summ. J. Ex. C (May 11, 2004 Letter). The May 11, 2004 letter provides:

> By Agreement dated August 13, 1992 Channelbind Corporation . . . and Esselte Business Systems, Inc. . . . entered into a Distribution Agreement . . . .
>
> The term of the Agreement was extended to December 31, 2004 and automatically renews unless terminated by either party by giving notice to the other party.
>
> Esselte Holdings Inc. as succession [sic] in interest to Esselte [Business Systems, Inc.] hereby notifies Channelbind that the Agreement shall terminate as of December 31, 2004.

(Id. Ex. D (May 11, 2004 Letter).)

Unlike the August 1999 Letter of Understanding, Channelbind and Esselte Business's correspondence in May and June 2005 evidences that they were attempting to negotiate a new contract that would be memorialized in a written document executed by all parties. In a May 25, 2005 letter, Magnus R. Nicolin, on behalf of Esselte Business, proposed terms and conditions to Channelbind upon which it was "willing to enter into a revised business relationship." (Pl. Mem. Opp'n Summ. J. Ex. 5 (May 25, 2005 Letter).) The letter further provided that "the terms and conditions set forth in this letter are essential to our ability to commit to that relationship and not negotiable." (Id. Ex. 5 (May 25, 2005 Letter).) The letter concluded with the following paragraph:

> As noted above, this letter sets forth the proposed terms for a revised business relationship that are acceptable to Esselte. This letter does not, and is not intended to, address all of the matters upon which agreement must be reached in order for Esselte and ChannelBind to enter into a definitive business agreement. Moreover, this letter does not, and is not intended to, give rise to any obligation on either Esselte or ChannelBind to continue negotiations, and either Esselte or ChannelBind may terminate our discussions at any time before a definitive business agreement is executed.

(Id. Ex. 5 (May 25, 2005 Letter).) In a June 16, 2005 letter, Hoffmeister, on behalf of Channelbind, responded to the proposed terms and conditions with additional proposed terms. The letter notes that the parties "seem to have trouble getting a contract updated" and suggests "the new term of three years start with the signing of the updated contract as opposed to July 1, 2005." (Id. Ex. 3 (June 16, 2005 Letter).) Further, the letter states that

> [i]f we never get [an updated contract] done, then we fall back to the basic form/terms of our prior Agreements updated for the items we have now agreed to – royalty, obligations upon termination, transfer of business, etc., and the term would be three years beginning July 1, 2005.

(Id. Ex. 3 (June 16, 2005 Letter).) However, in a June 30, 2005 letter, the last correspondence concerning the proposed agreement, Lundregan, on behalf of Esselte Business, again proposes terms and conditions and specifically provides that it does not intend for the letter to constitute a final agreement. The June 30, 2005 letter provides:

> Esselte believes that time is of the essence and would endeavor to negotiate and execute a mutually agreeable definitive agreement within sixty days of the date of this letter. This letter sets forth the proposed terms for a revised business relationship that are acceptable to Esselte. This letter does not, and is not intended to, address all of the matters upon which agreement must be reached in order for Esselte and ChannelBind to enter into a definitive agreement. Moreover, this letter does not, and is not intended to, give rise to any obligation on either Esselte or ChannelBind to continue negotiations, and either Esselte or ChannelBind may terminate our discussions at any time before a definitive agreement is executed.

(Defs. Mem. Supp. Summ. J. Ex. E (June 30, 2005 Letter).) The June 30, 2005 letter plainly provides only "proposed terms and conditions" and states that it is not intended to be a binding agreement. (Id. Ex. E (June 30, 2005 Letter).) Therefore, although the parties exchanged letters proposing terms and conditions, Channelbind and Esselte Business never reached an agreement. Moreover, it is undisputed that the parties never formally executed a written agreement. "Continual redrafting of key documents indicates the importance of the terms being negotiated and is evidence of the parties' intention not to be bound until the execution of a final written agreement." Tecart Industries, Inc. v. National Graphics, Inc., 198 F. Supp. 2d 719, 727 (D. Md. 2002).

The only inference that can be drawn from the correspondence is that the parties were engaged in negotiations in an effort to reach an agreement, but never reached an agreement. Further, the fact that Esselte Business continued to purchase products from or pay royalties to Channelbind does not transform the negotiations into a binding contract. Although Esselte

9

Business continued to purchase products from Channelbind, Channelbind could not legally require Esselte Business to purchase its products because there was no binding contract. Likewise, Esselte Business's payment of royalties to Channelbind does not support a finding that a binding contract existed. Notably, in the June 16, 2005 letter to Esselte Business, Hoffmeister states that the payment of royalties was "needed to continue" the negotiations. (Pl. Mem. Opp'n Summ. J. Ex. 3 (June 16, 2005 Letter).) The payment of royalties does not raise a genuine issue of material fact given the overwhelming evidence that Esselte Business did not intend to enter into a contract until all terms were agreed upon and a formal writing executed.

Further, having found that no contract exists, the parties' course of dealing is irrelevant. Course of dealing only applies when "a contract is silent as to a particular matter" or to the interpretation of an ambiguous contract. Keith v. River Consulting, Inc., 618 S.E.2d 302, 305 (S.C. Ct. App. 2005) ("[I]t is necessary for enforceability that the essentials of the contract be agreed upon *but all need not be expressed*. They may be implied from custom and usual forms [trade usage] and former course of dealing." (internal quotation marks omitted)); Moss v. Porter Bros., Inc., 357 S.E.2d 25, 27 (S.C. Ct. App. 1987). Based on the foregoing, after review of the correspondence between the parties, the court finds that no contract existed with any Defendant.[1] Therefore, the breach of contract claim fails.

---

[1] Channelbind alleges that it did business with all of the Defendants "over the years." (Pl. Mem. Opp'n Summ. J. 3.) Therefore, Channelbind alleges that "Defendants should [not] be allowed to hide behind the shell game of changing names and entities. Plaintiff is not privy to the Defendants' corporate structure as it may have changed from time to time. Plaintiff had a contract which all of the Defendants were performing at one time or another and in some fashion, which is entitled to be honored and enforced." (Id.) However, this issue is irrelevant in light of the court's determination that no contract existed. Therefore, the court will not address this issue.

In addition, Channelbind's claim that the letters between the parties standing alone are sufficient to constitute an agreement further fails because it does not satisfy the Statute of Frauds. S.C. Code Ann. § 32-3-10(5). "Any contract for an interest in land or any agreement that is not to be performed within one year must be in writing and signed by the party against whom it is seeking to be enforced. Failure to put such a contract in writing renders it void. Moreover, a contract required to be in writing by the South Carolina Statute of Frauds cannot be orally modified." Player, 382 S.E.2d at 894 (internal citations omitted). The only inference that can be drawn from the evidence is that the parties never reached a final agreement and it is undisputed that there is no signed written agreement. In addition, as noted above, the parties were negotiating a multi-year agreement. Therefore, any agreement must be reduced to a signed writing to satisfy the Statute of Frauds. Based on the foregoing, the court grants the Defendants' motion for summary judgment on the breach of contract claim.

## 2. Conversion

"Conversion is defined as the unauthorized assumption in the exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the owner's rights." Moseley v. Oswald, 656 S.E.2d 380, 382 (S.C. 2008). In other words, conversion is "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with" the rights of the owner. McPherson v. United Am. Ins. Co., 129 S.E.2d 842, 843 (S.C. 1963). In order to establish the tort of conversion, Channelbind must first establish "either title to or right to the possession of the personal property." Oswald, 656 S.E.2d at 382.

Channelbind alleges that it is entitled to a transfer of business, customer lists, and inventory upon termination of the parties' 1992 Agreements in June 2008. The complaint alleges the

> agreement between the parties was to extend through June 30, 2008. At that time, if the agreement was not extended, the Defendants were to transfer to the Plaintiff all the Defendant's business, including but not limited to equipment, supplies, customers and information, and the Defendants would cease distribution, manufacturing and sale of Plaintiff's products.

(Compl. ¶ 4.) Channelbind alleges that the Defendants' refusal "to transfer the business to the Plaintiff" upon termination on December 31, 2007, constitutes a conversion of Channelbind's property and property rights. (Id. ¶ 8.) Hoffmeister states in his affidavit that

> [o]ur agreement always included the transition of the business from Esselte to Channelbind on termination. The letter of June 30, 2005 from [Esselte Holdings] specifically provided that the parties would Acooperate [sic] prior to the termination date to transition the covered business (that is, the business established from years of distributing our products) from Esselte to Channelbind, including delivery of customer lists and discussion of the sale of existing inventory. All of these letters [from May and June 2005] provide for a three (3) year term, which would mean that our agreement extended through June 30, 2008. When we received notice, we still expected Esselte to transition the business to us and we began making preparations to take over the business.

(Hoffmeister Aff. ¶ 7.) Channelbind is seeking to allege a conversion claim based on property rights arising under a nonexistent contract. As discussed above, the parties' May and June 2005 correspondence indicates that the parties were negotiating a new agreement with different terms from the 1992 Agreements. A review of the correspondence reveals that Esselte Business proposed certain terms and conditions related to the transfer of business including that upon termination of the proposed new agreement Esselte Business would transition the "covered business from Esselte to ChannelBind" and provide Channelbind the option to purchase

12

equipment after termination. (Defs. Mem. Supp. Summ. J. Ex. E (June 30, 2005 Letter).) The court has found that the parties' May and June 2005 communications were negotiations in an effort to reach an agreement. However, the parties never reached a final agreement that was memorialized in a writing signed by both parties.

Further, Channelbind's conversion claim is solely based on obligations arising under an alleged contract. A cause of action in tort for conversion cannot be based on a claim for mere breach of contract. Ray v. Pilgrim Health & Life Ins. Co., 34 S.E.2d 218, 219 (S.C. 1945). In Ray, the South Carolina Supreme Court rejected a claim for conversion brought by a plaintiff who had been denied the refund of a deposit made in conjunction with an application for life insurance. The court noted that it was the defendant insurance company's obligation to refund the plaintiff's deposit pursuant to contract. The court stated: "[W]hatever responsibility attaches . . . is upon the contract, and the plaintiff cannot, by changing the form of his action, change the nature of the defendant's obligation, and convert that into a tort which the law deems to be a simple breach of an agreement." Id. (quoting Walter v. Bennett, 16 N.Y. 250, 252 (N.Y. Ct. App. 1857)). Channelbind cannot assert another breach of contract claim masked as a conversion claim. Based on the foregoing, Channelbind's conversion claim fails.[2]

---

[2] Notably, the 1992 Agreements provide that upon its termination, Esselte Business "shall immediately return to ChannelBind all technical and sales materials supplied to [it] by Channelbind and all confidential ChannelBind information." (Def. Mem. Supp. Summ. J Ex. A (Distributor Agreement § 15.3).) Confidential information includes "names of customers, locations of installed units of Binders sold by [Esselte Business], pending Customer orders, and financial information concerning [Esselte Business's] operations." (Id. Ex. A (Distributor Agreement § 13.2).) The Defendants do not dispute that the 1992 Agreements were valid contracts that were extended until the termination on December 31, 2004. The 1992 Agreements do not provide for the "transfer of business" or purchase of equipment by Channelbind upon termination.

Therefore, it is

**ORDERED** that the Defendants' motion for summary judgment, docket number 48, is granted.

**IT IS SO ORDERED.**

                                                s/Henry M. Herlong, Jr.
                                                Senior United States District Judge

October 28, 2009
Greenville, South Carolina